# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE AMERICAN BOTTLING COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | C.A. No.: N19C-03-048 AML CCLD |
| BA SPORTS NUTRITION, LLC and THE COCA-COLA COMPANY, | ) ) ) | |
| Defendants. | ) ) | |

Submitted: October 14, 2021
Decided: December 15, 2021
Publicly Issued: December 22, 2021

## MEMORANDUM OPINION

**Upon Plaintiff's Motion for Partial Summary Judgment: GRANTED
Upon Defendant BodyArmor's Motion for Summary Judgment: DENIED
Upon Defendant Coca-Cola's Motion for Summary Judgment: DENIED**

Garrett B. Moritz, Esquire, Elizabeth M. Taylor, Esquire of ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware, Robert C. Walters, Esquire, Russell H. Falconer, Esquire, Sophie C. Rohnke, Esquire, Andrew H. Bean, Esquire, Megan Z. Hulce, Esquire, and Emily A. Jorgens, Esquire of GIBSON DUNN & CRUTCHER LLP, Dallas, Texas, Attorneys for Plaintiff The American Bottling Company.

A. Thompson Bayliss, Esquire, and Daniel J. McBride, Esquire of ABRAMS & BAYLISS LLP, Wilmington, Delaware, David H. Bernstein, Esquire, Jyotin Hamid, Esquire, Jared I. Kagan, Esquire, Matthew J. Petrozziello, Esquire, Danielle Vildostegui, Esquire, and Sebastian Dutz, Esquire of DEBEVOISE & PLIMPTON, New York, New York, Attorneys for Defendant BA Sports Nutrition, LLC.

Rolin P. Bissell, Esquire, James M. Yoch, Jr., Esquire, Michael A Laukaitis II, Esquire, and Kevin P. Rickert, Esquire of YOUNG CONAWAY STARGATT &

TAYLOR, LLP, Wilmington, Delaware, Michael C. Holmes, Esquire, Craig E. Zieminski, Esquire, and Andrew E. Jackson, Esquire of VINSON & ELKINS LLP, Dallas, Texas, Attorneys for The Coca-Cola Company.

**LEGROW, J.**

For a period of three years, the plaintiff, American Bottling Company ("ABC"), and defendant, BA Sports Nutrition, LLC ("BodyArmor"), enjoyed a mutually profitable and productive relationship in which ABC was the nationwide distributor for BodyArmor's sports drinks under a distribution agreement negotiated between the parties. In 2018, ABC's corporate great-grandparent underwent a merger that resulted in a new entity controlling a majority of the corporate great-grandparent's stock. Although ABC's legal existence and ownership remained unchanged, and ABC retained responsibility for carrying out its obligations under the distribution agreement, changes did occur in the identity of various ABC managers and board members as a result of the merger. BodyArmor, put off by the new controlling entity's perceived lack of interest in acquiring BodyArmor as a whole, and concerned about personnel changes at ABC, took the position that the merger triggered BodyArmor's right to terminate the distribution agreement immediately, with cause, and without paying the substantial termination fee that BodyArmor otherwise would have been required to pay under the parties' contract. BodyArmor simultaneously signed a new distribution agreement with ABC's competitor, defendant The Coca-Cola Company ("Coca-Cola"). In connection with that new distribution agreement, Coca-Cola also purchased 15% of BodyArmor.

This litigation followed. ABC's claims have gone through various iterations, but ABC presently maintains a breach of contract claim against BodyArmor and a tortious interference with contract claim against Coca-Cola. After extensive pleadings-based motion practice and exhaustive discovery, each party filed a motion for summary judgment. ABC seeks summary judgment in its favor as to whether BodyArmor breached the distribution agreement by terminating it. BodyArmor similarly seeks summary judgment on this question, as well as on whether certain damages calculations ABC advances are barred under either the contract or because they are speculative. Finally, Coca-Cola contends the Court should award it summary judgment on ABC's tortious interference claim. This opinion resolves all three motions.

The dispute between ABC and BodyArmor requires this Court first to interpret the distribution agreement's termination provision, which gave BodyArmor a right to terminate the agreement "with cause" if (i) ABC transferred its rights or privileges under the distribution agreement by, *inter alia*, a change of control or a change of management, and (ii) ABC did not first obtain BodyArmor's consent, which BodyArmor could not withhold unreasonably. ABC argues no "transfer" occurred as a result of the merger, while BodyArmor argues the merger resulted in a change in management and a change of control, which transferred ABC's rights

2

and privileges to the control and oversight of new individuals at ABC and a new corporate great-grandparent.

The question before the Court is whether BodyArmor's interpretation is a reasonable one. If it is, the Court then must reach collateral issues regarding (1) whether ABC sought BodyArmor's consent, (2) whether BodyArmor refused to consent, and (3) if so, whether BodyArmor's refusal to consent was reasonable. Those collateral issues are irrelevant, however, because the Court concludes ABC's interpretation of the termination provision is the only reasonable one. That is, BodyArmor's right to terminate "with cause" was limited to circumstances in which ABC transferred its rights or privileges, which could happen – but does not necessarily happen – in connection with a change in management or a change of control. Because (1) ABC retained its rights and privileges under the agreement after the merger; and (2) ABC (as opposed to one of its upstream entities) did not take any action that resulted in either a transfer or a change in management or control, BodyArmor had no right to terminate when it did. Accordingly, ABC is entitled to summary judgment on the question of whether BodyArmor breached the contract. The issue BodyArmor raises regarding ABC's damages calculations cannot be resolved on the present record because whether the calculations are speculative turns on disputed issues of fact that must be presented at trial.

As to Coca-Cola's motion, the primary dispute between the parties on summary judgment is which state's law applies to Coca-Cola's tortious interference claim. Although Coca-Cola urges the Court to apply Georgia law to the claim because many of the contractual negotiations between Coca-Cola and BodyArmor occurred in Georgia or were conducted by Coca-Cola personnel located in Georgia, the factors applicable to a choice-of-law analysis favor applying Delaware law. Delaware is the unifying jurisdiction among the three parties: all three are incorporated in Delaware and all three selected Delaware as the law or forum that would apply if their various contractual relationships resulted in litigation. Because Delaware law applies, ABC's tortious interference claim must be considered by a jury, who will determine whether Coca-Cola acted "without justification" in interfering with the contract between ABC and BodyArmor.

Accordingly, and for the reasons explained below, the Court grants partial summary judgment to ABC on its breach of contract claim and denies summary judgment on the balance of the parties' motions.

### FACTUAL & PROCEDURAL BACKGROUND

The following facts are drawn from the record submitted by the parties and are undisputed unless otherwise noted.

4

## A. ABC and BodyArmor's Distribution Agreement

In 2015, BodyArmor entered into a distribution agreement (the "Distribution Agreement") with ABC, giving ABC the exclusive right to distribute BodyArmor's products throughout the United States.[1] At the time the parties entered into the agreement, BodyArmor was relatively unknown in the beverage industry and looking to expand its presence.[2] From 2015 to 2018, the number of stores selling BodyArmor more than tripled.[3]

The Distribution Agreement's initial term was ten years and automatically renewed for successive five-year terms.[4] ABC's primary performance obligation under the Distribution Agreement was to develop a plan "to maximize distribution and sales" of BodyArmor's products through marketing and maintaining supply to meet customer demand.[5] Distribution rights were "entered into by [BodyArmor], on the basis of careful investigation of [ABC's] reputation, experience and knowledge of its personnel."[6]

---

[1] Plf.'s Mot. for Partial Summ. J., (hereinafter, "Plf.'s Mot."), Ex. 6.
[2] D.I. 438, Mem. Op. at 2.
[3] Plf.'s Mot., Ex. 5.
[4] D.I. 413, Mem. Op. at 2.
[5] Plf.'s Mot., Ex. 6 § 4.
[6] Def. BodyArmor's Mot. for Summ. J., (hereinafter, "Def. BA's Mot."), Ex. 60, at § 10.2.

## B. Mike Repole's Relationship with ABC Personnel

Mike Repole ("Repole") is the co-founder and Chairman of BodyArmor. [7] By 2018, Repole had established a relationship of "trust, respect, and friendship" with various individuals at ABC, particularly Larry Young ("Young"), Marty Ellen ("Ellen"), and Rodger Collins ("Collins"). [8] Young, ABC's CEO, had over thirty years' experience in the beverage industry and had received numerous industry accolades due to his "excellent reputation." [9] Ellen, ABC's CFO, had worked in the beverage industry for more than a dozen years. [10] Collins, an Executive Vice President at ABC, had spent nearly forty years distributing beverages, served in leadership roles within the beverage industry, and had "extensive knowledge" about the industry. [11] Young and Ellen, in addition to serving as ABC's CEO and CFO, were two of the three members of its Board of Directors and the only two with operating roles. [12]

Repole's strong relationship with ABC personnel was due in part to a previous distribution contract between ABC and VitaminWater, an earlier beverage brand Repole co-created. [13] That collaboration with the ABC team was successful; Repole

---

[7] D.I. 413, Mem. Op at 3.
[8] Def. BA's Mot., Ex. 21 at ¶¶ 1-3, 31-32, 43-45.
[9] *Id*., Ex. 10, at 20:9-24, 26:23-27:14, 27:21-28:17; Exs. 11, 12.
[10] *Id*., Ex. 10, at 267:11-16; Ex. 5, at 18:6-9, 18:23-19:1.
[11] *Id*., Ex. 4, at 21:16-24:11.
[12] *Id*., Ex. 2, at 32:19-25; Ex. 13.
[13] *Id*., Ex. 10, 76:7-17; Ex. 4, at 43:21-44:3.

and his partners eventually sold VitaminWater for a significant sum.[14] Following that success, Repole frequently met and communicated with Young, Ellen, and Collins regarding the new beverage brand, BodyArmor.[15] He repeatedly expressed that BodyArmor placed a high value on its relationship with those three ABC executives.[16]

## C. The Distribution Agreement's Termination Provisions

The Distribution Agreement gave BodyArmor only limited rights to terminate the parties' agreement; it could terminate either (1) "Without Cause" or (2) "With Cause."[17] BodyArmor could terminate the Distribution Agreement "Without Cause" on three occasions: five, seven, or nine years into the initial term.[18] If BodyArmor terminated Without Cause or elected not to renew the Distribution Agreement after the initial term, it was required to pay a termination fee.[19] The Distribution Agreement also allowed BodyArmor to terminate the contract "With Cause" in limited circumstances.[20] Section 11.3.1(d) of the Distribution Agreement allowed BodyArmor to terminate "With Cause" if "[ABC] transfers or attempts to

---

[14] *Id.,* Ex. 21, at ¶¶ 1-3, 31-32, 43-45.
[15] *Id.*, Ex. 10, at 81:2-4; Ex. 5, at 85:10-14; Ex. 4, at 127:12-17.
[16] *Id.*, Ex. 23; Ex. 24; Ex. 25; Ex. 26; Ex. 27; Ex. 28; Ex. 29.
[17] D.I. 188, Mem. Op at 3; Plf.'s Mot., Ex. 6 § 11.2; Ex. 6 § 11.3.1(d).
[18] Plf.'s Mot., Ex. 6 § 11.2; Ex. 8 § 11.2.
[19] *Id.*, Ex. 6 §11.5; Ex. 8 §11.5.
[20] *Id.*, Ex. 6 § 11.3.1(d).

7

transfer, directly or indirectly, any of its rights or privileges hereunder in violation of Section 10.2 [of the Distribution Agreement]."[21]  Section 10.2 provides:

> This Agreement is being entered into by [BodyArmor], on the basis of careful investigation of [ABC's] reputation, experience and knowledge of its personnel.  This Agreement and [ABC's] duties and privileges may not, without the prior written approval of [BodyArmor] (which consent shall not be unreasonably withheld) be transferred by assignment, pledge or hypothecation, merger, consolidation, reorganization or similar event, change in the management or control of [ABC], sale or transfer of securities or otherwise by operation of law, or sale of all or a substantial portion of [ABC's] business or assets, or otherwise.[22]

Because the two provisions work in tandem, the Court refers to Sections 11.3.1(d) and 10.2 as the "Termination Provision" throughout this opinion.

### D. The Merger and ABC's Structure

Before January 2018, ABC was a wholly-owned subsidiary of Dr. Pepper Snapple Group ("DPSG"), its publicly traded upstream parent company.[23]  DPSG owned ABC through two intermediate entities.[24]

From 2015 to 2018, the parties each performed their obligations under the Distribution Agreement and enjoyed a productive partnership.[25]  On January 29, 2018, however, DPSG announced an intent to enter into a transaction (the "Merger")

---

[21] *Id.*
[22] *Id.*, § 10.2.
[23] D.I. 188, Mem. Op. at 2.
[24] *Id.*
[25] Plf.'s Mot., Ex. 9.

involving JAB Holding Company ("JAB").[26]  Through a reverse triangular merger, (1) Keurig Green Mountain, Inc. ("Keurig") would become an indirect wholly-owned subsidiary of DPSG, (2) JAB would receive a majority of DPSG's shares, (3) and DPSG would change its name to Keurig Dr. Pepper ("KDP").[27]  The Merger was accomplished when a JAB subsidiary, Maple Parent Holdings Corp, merged with a DPSG subsidiary, Salt Merger Sub, Inc, with Maple Parent surviving the transaction as a wholly-owned subsidiary of DPSG.[28]  Neither ABC nor its parent or grandparent entities was one of the merging entities.[29]

After the Merger, DPSG changed its name to KDP but remained the same corporation.[30]  Just as before the Merger, ABC was owned by DPS Holdings, Inc. and Snapple Beverage Corporation.[31]  DPS Holdings, Inc. was wholly-owned by DPS Americas Beverages, LLC.  Ownership of DPSG, however, did shift as a result of the Merger.  Before the Merger, all DPSG's stock publicly was owned and traded.

---

[26] *Id.*, Ex. 12.

[27] *Id.*

[28] *Id.*, Ex. 15.

[29] *Id.*, Ex. 14; Ex. 15 at 510. ABC's parent company is DPS Holdings Inc., and its grandparent company is DPS Americas Beverages, LLC.

[30] D.I. 413, Mem. Op. at 3.

[31] Plf.'s Mot., Ex. 15.  Before and after the Merger, DPS Holdings owned 95.6% of ABC, with Snapple Beverage Corp. owning the remaining 4.4%.  DPS Holdings owned Snapple Beverage Corp., effectively giving DPS Holdings complete control of ABC.

After the Merger, JAB owned 87% of DPSG's stock, while the remainder was owned publicly.[32] The Merger closed in July 2018.[33]

## E. Changes to ABC's Board and Management Post-Merger

Following the Merger, Keurig/JAB became responsible for selecting ABC's management and board members.[34] Two Keurig executives, Robert Gamgort ("Gamgort") and Ozan Dokmecioglu ("Dokmecioglu") replaced Young and Ellen as ABC's CEO and CFO, respectively.[35] Gamgort and Dokmecioglu also replaced Young and Ellen as members of ABC's board.[36] Collins was to resign from his position within one year of the Merger's closing.[37] Additionally, Gamgort selected a new management team for ABC which resulted in the departure or replacement of twelve of ABC's officers.[38] Two of the three regional managers were transitioned out in connection with the Merger.[39] After working with JAB's replacements, Repole expressed concern that he and JAB had "incompatible styles and philosophies[.]"[40]

---

[32] *Id.*, Exs. 12, 14, 15, 16.
[33] D.I. 413, Mem. Op. at 2-3.
[34] Def BA's Mot., Ex. 18 at '898; Ex. 75 (confirming that "the D&O slates for after the effective time [of the Merger]" would "come from [Keurig]").
[35] *Id.*, Ex. 31, at '759.
[36] *Id.*, Ex. 34; Ex. 14.
[37] *Id.*, Ex. 4, at 60:15-61:8, 62:13-63:2; Ex. 35.
[38] *Id.*, Ex. 6, at 150:1-153:1.
[39] *Id.*, Ex. 40; Ex. 4, at 31:19-32:10, 66:25-67:20.
[40] *Id.*, Ex. 49; Ex. 50.

## F. Repole Contacts The Coca-Cola Company

Although ABC and BodyArmor contest whether ABC sought and whether Repole withheld his consent to the Merger,[41] it is undisputed that Repole's consent would be necessary under the Distribution Agreement if the Merger resulted in a transfer by change in management or control.[42] The record reflects that Repole spoke extensively with ABC and JAB in the months after the Merger's announcement.[43]

After the Merger was announced, but before it closed, Repole also contacted The Coca-Cola Company ("Coca-Cola").[44] Repole told Coca-Cola the Merger effectively was a change in control as defined in the Distribution Agreement, permitting BodyArmor to terminate "With Cause."[45] Discussions with Coca-Cola

---

[41] D.I. 615; D.I. 618; D.I. 623.

[42] *See* Plf.'s Mot., Ex. 6 § 11.3.1(d). ABC filed a supplemental submission regarding its partial summary judgment motion concerning Repole's recent deposition testimony (hereinafter, "Plf.'s Supp. Sub."). ABC contends Repole gave unequivocal testimony that ABC repeatedly sought BodyArmor's consent. ("When I spoke to [Collins] the day of the deal, . . . [Collins] clearly said 'Mike, we need you to consent.'") Plf.'s Supp. Sub. Ex. 1, 105:12-15. *See also* Ex. 1 at 123:5-10, 124:12:21, 195:8, 198:14-15; 199:8-10; 199:20; 226:12-14; 250: 14-15. BodyArmor alleges Repole did not testify "either (a) that ABC ever made a formal request that BodyArmor consent to the transfer of distribution rights through the changes in the management and control of ABC that would occur upon the closing of the merger, or (b) that BodyArmor unequivocally would have refused such a formal request had it ever been made. Rather, Mr. Repole testified [] that Collins . . . tried to pressure him early in 2018 (just after the merger was announced) to confirm that he would consent at a later date when and if ABC formally sought consent…" Def. BodyArmor's Resp. to Plf.'s Supp. Sub. at 2; *see also* Ex. 1 at 201:10-19; 124:5-125:16; 200:1-21.

[43] Plf.'s Mot., Ex. 21-23.

[44] D.I. 438, Mem. Op. at 2.

[45] Def. Coca-Cola's Mot. for Summ. J. (hereinafter, "Def. Coca-Cola's Mot."), Ex. 7, Hastie Dep. 88:11-24; Ex. 8, BODYARMOR00138992, AT '002.

about BodyArmor's distribution rights commenced, with Repole making it "very clear that [BodyArmor] had a change-of-control provision [in the Distribution Agreement] that allowed [BodyArmor] to move distribution" to another partner.[46] Coca-Cola was interested in being that partner.

## G. Negotiations between Coca-Cola and BodyArmor

In mid-February 2018, Coca-Cola executives met in Atlanta to consider the company's strategic fit for BodyArmor.[47] Coca-Cola spent months creating projections and valuation models.[48] While negotiating with BodyArmor, Coca-Cola became concerned that a partnership with BodyArmor exposed Coca-Cola to a potential claim for tortious interference with the Distribution Agreement.[49] But Coca-Cola's attorneys and outside counsel reviewed the Distribution Agreement and concluded it allowed BodyArmor a broad right to terminate because the Merger resulted in a change of control of ABC.[50] First, Coca-Cola's counsel presumed that because ABC was part of an integrated organization that underwent a change of

---

[46] *Id.*, Ex. 7, Hastie Dep. 88:11-24; Ex. 8, BODYARMOR00138992, AT '002.
[47] Def. Coca-Cola's Mot., Ex. 10, at '487-89; '493.
[48] *Id.*, Ex. 35, COCA-COLA_0037001; Ex.36, Drucker Dep. 79:14-82:12.
[49] *Id.*, Ex. 37, UyHam Dep. 39:11-16, 40:22-41:19, 42:15-43:7, 47:4-49:12.
[50] *Id.*, Ex. 37, UyHam Dep. 97:21-25; Ex. 38, Baglio Dep. 33:9-15. Coca-Cola's in-house counsel analyzed SEC filings related to the Transaction and concluded that based on (1) a new controlling stockholder, (2) changes to the majority of the board, and (3) the fact that ABC was a subsidiary of DPSG, there was a change in control at DPSG's "integrated" enterprise, including its distribution subsidiary, ABC. Def. Coca-Cola's Mot., Ex. 37, UyHam Dep. 98:7-23, 125:7-126:22; *see also* Ex. 42, Dr. Pepper Snapple Group, Schedule 14A (Preliminary Proxy Statement) at 12-14, 39, 41, 49 (May 14, 2018).

control, the Distribution Agreement's Termination Provision was triggered.[51] Additionally, Coca-Cola's counsel believed the Termination Provision allowed BodyArmor to terminate because ABC directly or indirectly transferred its rights or privileges in violation of that provision.[52] Lastly, Coca-Cola confirmed during its due diligence that ABC had not requested BodyArmor's consent to the Merger.[53] Repole was "consistent and clear" that he had a change-of-control provision.[54] Based on these considerations, Coca-Cola's lawyers were comfortable moving forward with a transaction with BodyArmor.[55]

Even so, Coca-Cola recognized the risk of litigation and liability and negotiated for BodyArmor to indemnify Coca-Cola if ABC sued. The Unit Purchase Agreement ("UPA") Coca-Cola and BodyArmor ultimately signed included a detailed clause requiring BodyArmor to indemnify Coca-Cola if it incurred liability to ABC.[56] That UPA included Delaware forum and choice of law provisions.[57]

---

[51] Def. Coca-Cola's Mot., Ex. 37, UyHam Dep. 97:17-98:23.
[52] *Id.*, Ex. 41, ABC0089996 at '003.
[53] *Id.*, Ex. 37, UyHam Dep. 100:19-25; Ex. 43, COCA-COLA_0054736, at '738 (BodyArmor's termination letter clearly stated that ABC had not requested consent); Ex. 37, UyHam Dep. 101:10-23 (document review reflected no such request).
[54] *Id.*, Ex. 7, Hastie Dep. 89:13-90:16, 93:9-22, 94:16-19.
[55] *Id.*, Ex. 37, UyHam Dep. 97:17-25, 195:8-197:24; Ex. 38 Baglio Dep. 141:4-13.
[56] *Id.* Ex. 36, Drucker Dep. 137:8-12, 138:5-12, 141:3-25, 151:3-10, 213:2-8, 213:13-23; Ex. 47, Lewendon Dep. 116:13-18; Ex. 50, COCA-COLA_0002698; Ex. 49, Quintero-Johnson Dep. 151:1-8, 152:4-10, 154:4-13.
[57] Plf.'s Br. in Opp. to Def. Coca-Cola's Mot. for Summ. J. (hereinafter, "Plf.'s Br. in Opp. to Def. Coca-Cola"), Ex. 43.

The initial in-person meeting between BodyArmor and Coca-Cola was held on April 19, 2018, in Atlanta.[58] Over the next few months, the parties negotiated by phone and email from various geographical locations and conducted due diligence in New York.[59] On July 19, 2018, Coca-Cola's Board of Directors met in Atlanta to authorize the deal team to negotiate an agreement with BodyArmor.[60] A Letter of Intent ("LOI")[61] was finalized on July 27, 2018, indicating BodyArmor would terminate the Distribution Agreement with ABC and transfer exclusive distribution rights to Coca-Cola.[62] On August 13, 2018, BodyArmor officially terminated the Distribution Agreement with ABC "With Cause."[63] BodyArmor simultaneously signed a two-step deal with Coca-Cola where Coca-Cola paid $300 million to acquire (1) a 15% ownership stake in BodyArmor, (2) distribution rights for BodyArmor's products, and (3) a right to purchase the remaining 85% of BodyArmor in November 2021.[64] Repole sent ABC notice the same day, advising

---

[58] Def. Coca-Cola's Mot., Ex. 11, COCA-COLA_0001283, at '283; Ex. 78, COCA-COLA_0002658.

[59] Plf.'s Br. in Opp. to Coca-Cola's Mot., Ex. 80, 109, 110 (reflecting negotiations from Australia, California, and Italy); Ex. 107 (reflecting due diligence conducted in New York).

[60] Def. Coca-Cola's Mot., Ex. 44, COCA-COLA_ 000567, AT '567, '576, '579-80. The deal documents negotiated between the parties reflected BodyArmor's assertions that it had a change of control provision, it wanted to leave KDP, and no termination payment was required as part of DPSG's change of control.

[61] Plf.'s Mot., Ex. 42.

[62] Def. Coca-Cola's Mot., Ex. 46, Hadley Dep. 276:9-24; Ex.47, Lewendon Dep. 48:7-49:12; Ex. 48, BODYARMOR00019208, at '211-12.

[63] Def. BA's Mot., Ex. 57.

[64] Plf.'s Mot., Ex. 43 at COCA-COLA000131, COCA-COLA000142-45.

that BodyArmor signed a deal with Coca-Cola and was terminating the Distribution Agreement "With Cause."[65]

## H. Relevant Filings in this Court[66]

On March 11, 2019, ABC filed this case against BodyArmor and Repole.[67] ABC's complaint alleged (1) a breach of contract claim against BodyArmor, (2) a promissory estoppel claim against BodyArmor, and (3) a tortious interference with contract claim against Repole.[68] Both Repole and BodyArmor moved to dismiss the complaint under Superior Court Civil Rules 12(b)(2) and 12(b)(6).[69]

In its motion to dismiss, BodyArmor argued that under the Distribution Agreement's Termination Provision, each of the transactions listed after the words "transferred by" ("assignment," "pledge or hypothecation," etc., "or otherwise") was, by definition, a transfer of the Agreement.[70] The Merger, BodyArmor argued, resulted in a change in management and a change in control of ABC, and BodyArmor was entitled to terminate the agreement "With Cause" since ABC did not seek BodyArmor's prior written approval.[71] ABC argued the Termination

---

[65] *Id.*, Ex. 3.
[66] The motion practice in this case has been prolific. A complete description would take on the length of a Tolstoy novel, with none of the plot twists or literary interest. What follows is a bare summary of the relevant procedural events.
[67] Plf.'s Initial Compl.
[68] *Id.* ¶¶ 17-19.
[69] D.I. 29, Defs. BA's and Repole's Mot. to Dismiss.
[70] D.I. 40, Def. BA's Reply Br. at 5-6.
[71] D.I. 29, Def. BA's Br. in Supp. of Mot. to Dismiss at 1-2.

Provision provided a non-exclusive list of events that might constitute a transfer, but that the Termination Provision only could be triggered if ABC actually transferred the Distribution Agreement or its duties and privileges thereunder.[72]

The Court denied BodyArmor's motion to dismiss and held that (1) the critical question is whether a transfer occurred, and (2) ABC's interpretation of the Termination Provision was "reasonable."[73]  As to Repole's motion to dismiss the tortious interference claim against him, the Court granted that motion but gave ABC leave to replead its claim.[74]  ABC filed an amended complaint, and Repole and BodyArmor filed an answer and affirmative defenses.

After conducting some discovery, including third-party discovery of Coca-Cola, ABC moved for leave to file a second amended complaint in order to add a new tortious interference claim against Coca-Cola.[75]  This second amended complaint contained new allegations of fact, prompting Repole and BodyArmor to file new motions to dismiss the tortious interference claim against Repole and the promissory estoppel claim against BodyArmor.  After briefing, the Court dismissed the claim against Repole, holding that ABC had not alleged facts to overcome the

---

[72] Plf.'s Initial Compl. ¶ 61.
[73] D.I. 47, Tr. 84:13-14, 86: 9-11, 86:21-87:2.  Because that conclusion was sufficient to allow ABC's claims to proceed, the Court declined to determine at that early stage whether ABC's interpretation was the *only* reasonable interpretation of the Termination Provision.
[74] *Id.*, Tr. 92:8-16, 93:1-4.
[75] D.I. 52.

legal presumption that Repole acted in BodyArmor's best interests.[76]  As to the promissory estoppel claim, the Court held the second amended complaint's allegations supporting that claim had not changed materially and therefore the Court's previous ruling denying dismissal remained law of the case.[77]  ABC, however, later voluntarily dismissed the promissory estoppel claim.[78]

On July 30, 2021, all three parties - ABC, BodyArmor, and Coca-Cola - filed their motions for partial or complete summary judgment.[79]  The case is scheduled for a two-week jury trial to begin on January 31, 2022.

## I.  Parties' Contentions

In its motion for partial summary judgment, ABC contends the Court should enter judgment as a matter of law in its favor as to whether BodyArmor breached the Distribution Agreement.[80]  According to ABC, the Termination Provision only is triggered upon a transfer of ABC's duties or obligations under the Distribution Agreement, including by change in management or change in control.  Undisputed facts, it contends, show no such transfer took place.  The rights and obligations associated with the Distribution Agreement remained with ABC after the Merger. ABC alternatively argues that even if this Court finds a transfer of rights or

---

[76] *American Bottling Co. v. Repole*, 2020 WL 7787043, at *6 (Del. Super. Ct. Dec. 30, 2020).
[77] *Id*. at *8.
[78] D.I. 483.
[79] D.I. 487, 489, 491.
[80] *See* Plf.'s Mot.

obligations did occur, or that there is a factual dispute regarding the transfer question, judgment as a matter of law in ABC's favor nevertheless is appropriate because BodyArmor had no reasonable basis to withhold its consent.

In response, and in its own motion, BodyArmor contends summary judgment should be entered in its favor because there is no genuine dispute that ABC's distribution rights were transferred to new management and a new controller without BodyArmor's approval.[81] The new management placed new leadership personnel in key positions that disrupted the relationships Repole previously enjoyed with ABC's pre-merger personnel.[82] BodyArmor argues ABC never sought BodyArmor's consent, and the Court therefore should rule in BodyArmor's favor and need not determine whether BodyArmor had a reasonable basis to withhold approval of the transfer.[83]

Finally, Coca-Cola contends the Court should grant its summary judgment motion on ABC's claim that Coca-Cola tortiously interfered with the Distribution Agreement.[84] Coca-Cola argues Georgia law applies to the tortious interference claim against it, and ABC has not alleged that Coca-Cola committed "improper action or wrongful conduct," which is a necessary element of such a claim under

---

[81] Def. BA's Mot. at 10.
[82] *Id*. at 2.
[83] *Id*. at 1.
[84] Def. Coca-Cola's Mot. at 1.

Georgia law.[85] Additionally, Coca-Cola asserts this Court should rule in its favor even if Georgia law does not apply to the tortious interference claim against it, because BodyArmor's termination of the Distribution Agreement did not constitute a breach of contract.[86] Echoing BodyArmor's arguments, Coca-Cola contends BodyArmor's termination of the Distribution Agreement was permitted as a matter of law because a merger of ABC's upstream corporate parent caused fundamental changes at the parent and ABC that required BodyArmor's consent, which ABC never sought or obtained.[87]

ABC responds to Coca-Cola's argument by contending that it orchestrated a lengthy effort to lure BodyArmor away from ABC, knowing that doing so would require BodyArmor to breach the Distribution Agreement with ABC.[88] ABC contends Delaware law applies to its tortious interference claim, but asserts that regardless of the law governing this claim, it is entitled to present the tortious interference claim against Coca-Cola to a Delaware jury.[89]

A determination of whether BodyArmor breached the Distribution Agreement potentially is dispositive of Coca-Cola's motion for summary judgment on the

---

[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] Plf.'s Br. in Opp. to Coca-Cola's Mot. for Summ. J. at 1.
[89] *Id.* at 2.

19

tortious interference claim against it. For that reason, I begin with ABC's and BodyArmor's motions.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[90] The movant bears the initial burden of demonstrating its motion is supported by undisputed material facts.[91] If that burden is met, the non-movant then must demonstrate that there is a "genuine issue for trial."[92] To determine whether material facts are in dispute, the Court construes the record in the light most favorable to the non-movant.[93]

## I. BodyArmor breached the Distribution Agreement by terminating it in contravention of the Termination Provision.

Before this Court resolves a breach of contract claim, it first must decide the state's law that applies to the contract. In this case, Illinois law governs the breach of contract question because of the contractual choice of law provision included in

---

[90] Del. Super. Ct. Civ. R. 56(c).
[91] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citing *Ebersole v. Lowengrub*, 180 A.2d 467 (Del. 1962)).
[92] Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.")
[93] *Judah v. Del. Tr. Co.*, 378 A.2d 624, 632 (Del. 1977).

the Distribution Agreement.[94]    Under Illinois law, the elements of a breach of

contract claim are: (1) existence of a valid and enforceable contract; (2) performance

by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to

the plaintiff.[95]   No dispute exists between the parties as to any element other than

breach.[96]

The rules governing Illinois contractual interpretation generally track those of

Delaware.   The construction of a contract is a question of law.[97]   A contract is

ambiguous if it is subject to more than one reasonable interpretation.[98]   But the mere

fact that parties disagree over the contract's interpretation does not suffice to

establish ambiguity.[99]

## A. ABC offers the only reasonable interpretation of the Termination Provision's contractual language.

In denying BodyArmor's motion to dismiss ABC's breach of contract claim, this

Court already held that ABC's interpretation of the Termination Provision was

---

[94] Plf.'s Mot., Ex. 6 § 19.1.

[95] *Henderson-Smith & Assocs., Inc. v. Nahamani Fam. Serv. Ctr., Inc*., 752 N.E.2d 33, 43 (Ill. App. Ct. 2001).

[96] The parties dispute the amount of damages the plaintiff may be entitled to if BodyArmor breached the agreement.  *See* Section II, *infra*.

[97] *People ex rel. Dept. of Pub. Health v. Wiley*, 843 N.E.2d 259, 268 (Ill. 2006) (citing, *e.g*., *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664 (Ill. 1991) ("The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law.")

[98] *Gomez v. Bovis Lend Lease, Inc*., 22 N.E. 3d 1, ¶ 14 (Ill. App. Ct. 2013) (citing *William Blair & Co., LLC v. Fl Liquidation Corp*., 830 N.E.2d 760 (Ill. App. Ct. 2005)).

[99] *Id.* (citing *Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n*, 885 N.E.2d 532 (Ill. 2008)).

reasonable.[100] That ruling is the law of the case. In order to resolve ABC's Motion for Partial Summary Judgment, therefore, this Court first must determine whether BodyArmor's interpretation also is reasonable. BodyArmor contends that a change in management or change in control at ABC or its upstream entities constituted a transfer under the parties' agreement. ABC argues this is not a reasonable reading of the Termination Provision.

Illinois courts interpret contracts to give effect to the parties' intent.[101] The best indication of the parties' intent is the plain meaning of the contract's language.[102] To accord undefined terms their plain, ordinary, and popular meanings, Illinois courts and this Court look to dictionary definitions of the words the parties chose.[103]

The word "Transfer" generally means:

"To convey or remove from one place, person, etc., to another; pass or hand over from one to another; specifically, to change over the possession or control of (as, to transfer a title to land)."[104]

---

[100] D.I. 47, Tr. 84:13-14, 86: 9-11, 86:21-87:2.

[101] *Shapich v. CIBC Bank USA*, 123 N.E.3d 93, 98 (Ill. App. Ct. 2018) ("In construing a contract, our primary objective is to give effect to the intent of the parties.") (citing *Thompson v. Gordon*, 948 N.E.2d 39 (Ill. 2011)).

[102] *Gomez*, 22 N.E. at ¶ 13 (citing *Gallagher v. Lenart*, 874 N.E.2d 43 (Ill. 2007)).

[103] *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E. 2d 307, 316 (Ill. 2006); *see also Tetragon Fin. Grp. Ltd. v. Ripple Labs Inc.*, 2021 WL 1053835, at *4 (Del. Ch. Mar. 19, 2021) (*citing Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) "...[D]ictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract.") *Id*.

[104] Black's Law Dictionary 1342 (5th ed. 1979) (adopted in *People v. McGee*, 628 N.E. 2d 867 (Ill. App. Ct. 1993)).

Under the Termination Provision's plain language, there must be a transfer of the Distribution Agreement or ABC's duties and privileges thereunder to trigger BodyArmor's right to terminate "With Cause." Evidence that a change in management or change in control occurred at ABC or at its parent or grandparent levels is not enough to indicate a "transfer" occurred. BodyArmor's interpretation to the contrary (*i.e.,* that a change in management or a change in control alone constitutes a transfer) is not a reasonable one because it conflates "transferred" with "change in control" or "change in management." That result contravenes settled law that courts should endeavor to interpret contracts in a way that accords meaning to each term.[105]

BodyArmor's interpretation also ignores the word "by" in Section 10.2's second sentence. "By" is defined as "through the instrumentality of."[106] Under Section 10.2's plain terms, ABC's rights or obligations must be transferred by, that is through the instrumentality of, a transaction or event. The word "by" confirms that the examples that follow must actually affect a transfer and do not themselves automatically constitute a transfer.

---

[105] *See, e.g.*, *RBC Mortg. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728, 735 (Ill. App. Ct. 2004); *Boise Cascade Home & Land Corp. v. Utilities, Inc.*, 468 N.E.2d 442, 447 (Ill. App. Ct. 1984).

[106] *By,* Merriam-Webster (online ed.), www.merriam-webster.com/dictionary/by (last visited Oct. 23, 2021). *See also Loughrin v. U.S.*, 573 U.S. 351, 363 (2014) (defining "by means of" as "through the instrumentality of: by the use of as a means") Webster's Third New International Dictionary 1399 (2002).

The parties intended the Termination Provision to be triggered only upon a transfer of ABC's rights and privileges, with the language that follows "transferred by "providing non-exclusive exemplars of ways in which such a transfer could occur. This interpretation is consistent with the "or otherwise" catchall at the end of the Termination Provision. ABC's interpretation also is consistent with the fact that some of the other listed examples, in addition to changes in management or control, would not automatically result in a transfer under the law. Whether a transfer occurred concerning a merger, consolidation, or reorganization would depend on the facts.[107]

Other portions of the Distribution Agreement confirm that BodyArmor's reading is not a reasonable one. The Termination Provision is not drafted as a "key man" provision, which is a clause that identifies particular individuals whose departure would constitute a basis to terminate the contract. If BodyArmor intended to condition the Distribution Agreement's continuation on BodyArmor's right to

---

[107] *In re Verizon Appeals*, 222 A.3d 566, 580 (Del. 2019) (holding that the parenthetical "(including, but not limited to, the purchase or sale or offer or solicitation of an offer to purchase or sell securities)" after "regulating securities" (1) did not restrict the meaning of "regulating securities" to laws specific to securities transaction because it was expressly "not limited;" (2) the "purchase or sale" clause provided only a non-exhaustive example of the type of "regulation, rule or statute regulating securities" that the definition sought to cover; and (3) including one example did not mean the definition was no longer tethered to laws regulating securities. *See also Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH,* 62 A.3d 62,87 (Del. Ch. Feb. 22, 2013) (in a reverse triangular merger, change of ownership, "without more [] is not regarded as assigning or delegating" contractual rights of the purchased entity); *Lewis v. Ward*, 2003 WL 22461894 at *4, n. 18 (Del. Ch. Oct. 29, 2003) (in a reverse triangular structure, rights and obligations of target are not transferred or affected).

consent to a change in key management or board positions, it could have drafted language to accomplish that result. Such provisions exist within commercial practice.[108]

Moreover, under the interpretation BodyArmor urges this Court to adopt, the Termination Provision inevitably would be triggered by natural attrition or retirements at the management and board level. This result would render meaningless the parties' negotiated provisions regarding the terms of the Distribution Agreement and its renewal process. Under BodyArmor's interpretation, at some (undefined) point, with enough changes in management or board roles, the Termination Provision inevitably would be triggered. But when that would occur or how the parties would know it occurred remains unclear.

When pressed at oral argument, BodyArmor could not coherently respond to this concern, except to acknowledge that it would require a fact-intensive inquiry and would be subject to the requirement that BodyArmor provide "reasonable" consent.[109] This response is particularly remarkable when coupled with BodyArmor's contention that, if ABC did not seek BodyArmor's consent,

---

[108] *See, e.g.*, *Beard Research, Inc., v. Kates*, 8 A.3d 573, 583 (Del. Ch. 2010) (describing contract containing "a 'key man clause' which state[d]: 'The following shall constitute events of termination . . .: departure or reassignment of [two identified individuals] unless [contracting parties] agree to a replacement.'")
[109] D.I. 592, Tr. 55.

BodyArmor's obligation to provide reasonable consent would be waived.[110] BodyArmor's interpretation therefore would place ABC in the untenable position of not knowing when BodyArmor would contend a particular management or board-level change crossed the threshold and resulted in a "transfer." This result effectively would require ABC to seek BodyArmor's consent for every such change, giving BodyArmor a veto right over all personnel decisions. Even then, ABC still would be powerless to avoid triggering the Termination Provision because ABC would have no power to prevent resignations or retirements.

BodyArmor seeks to avoid the unambiguous effect of the Termination Provision's terms by pointing to Section 10.2's first sentence, which states: "[t]his Agreement is being entered into by [BodyArmor], on the basis of careful investigation of [ABC's] reputation, experience and knowledge of its personnel." But the Termination Provision's first sentence neither introduces ambiguity nor renders BodyArmor's interpretation reasonable.[111] The Distribution Agreement's

---

[110] Def. BA's Answering Br. in Opp., at 23 ("In fact, by choosing not to request BodyArmor's prior approval in the face of uncertainty about BodyArmor's position, and by choosing to refrain from articulating its own position, ABC waived its right to insist that BodyArmor articulate any reasonable basis for withholding approval under Illinois law.") *Id*.

[111] The parties dispute the meaning of Section 10.2's first sentence, with ABC arguing it indicates BodyArmor entered into the Distribution Agreement based on ABC's own knowledge of its personnel, not (as BodyArmor contends) based on BodyArmor's knowledge of ABC's personnel. Although there is some grammatical basis for ABC's proffered interpretation, it makes little sense in the context of the entire paragraph and the transaction as a whole. In any event, the Court accords the sentence the meaning urged by BodyArmor, but nonetheless concludes the sentence does not support BodyArmor's interpretation of the Termination Provision's meaning.

vague references to BodyArmor's knowledge of ABC's personnel cannot change the parties' agreement to condition BodyArmor's termination right on a transfer of ABC's duties or privileges. The first sentence of Section 10.2 must be read in conjunction with that section's remaining sentence and with Section 11.3.1(d), which incorporates Section 10.2. Read as a whole, those sections did not give BodyArmor the right to terminate whenever ABC's personnel changed. Again, had BodyArmor intended to give itself a right to withdraw from the contract upon the departure of particular individuals, it could have drafted language to that effect.

## B. No transfer by change of control or change in management occurred in conjunction with the Merger.

### 1. The Merger did not result in a transfer by change of control within ABC.

The Distribution Agreement allowed BodyArmor to terminate its arrangement with ABC if a change of control occurred. The parties disagree whether change of control is a board-level or stockholder-level inquiry.[112] But under either analysis, no transfer occurred here. ABC did not cause any transfer by change of control as required by the Termination Provision because ABC did not effectuate the Merger.

The parties have not pointed to any binding precedent controlling the resolution of this issue. But courts in other jurisdictions have held a change of control in an upstream parent company does not transfer a contract held by a

---

[112] D.I. 596, Tr. 51:19-52:3.

downstream subsidiary.[113]  For example, in *Foundation for Seacoast Health v. HCA Health Servs. of New Hampshire, Inc.*, the New Hampshire Supreme Court addressed a right of first refusal that was triggered if the defendant, its successors, or its wholly-owned subsidiary "directly or indirectly by merger or transfer of stock or otherwise sell, transfer, assign, or otherwise dispose of all or any substantial part of the assets" of the hospital at issue in the case.[114]  The plaintiff in that case argued two transactions that occurred at the defendant's parent level triggered the right of first refusal because, *inter alia*, the contractual provision referred to transfers conducted "directly or indirectly."[115]  The New Hampshire Court disagreed, focusing on the provision's language stating "neither [defendant] nor [defendant's subsidiary] will" transfer the assets.  The Court held that language unambiguously specified that only two actors – the defendant and its subsidiary – could trigger the right of first refusal.[116]  The Court therefore reasoned that an action taken by a parent or upstream entity could not trigger the right of first refusal.[117]

---

[113] *See, e.g., Found. for Seacoast Health v. HCA Health Servs. of New Hampshire, Inc.*, 953 A.2d 420, 430 (N.H. July 15, 2008).  Although this case is from New Hampshire, Illinois law accords with its holding.  *See, e.g., Transamerica Commercial Fin. Corp. v. Stockholder Sys., Inc.*, 1990 WL 186088, *2 (N.D. Ill. 1990).  In *Transamerica*, the Court held that a contract signed by a party and prohibiting that party from transferring a software license was not violated by a merger involving the party's parent company because the agreement did not prohibit the parent company from doing anything.  *Id*.

[114] *Found. for Seacoast* Health, 953 A.2d at 423.

[115] *Id.* at 425-26.

[116] *Id.* at 425.

[117] *Id.*  In so holding, the New Hampshire Court distinguished several cases on which BodyArmor relies, including *H-B-S P'ship v. Aircoa Hosp.*, 114 P.3d 306 (N.M. Ct. App. 2005); *In re Asian Yard Partners*, 1995 WL 1781675 (Bankr. D. Del. Sept. 18, 1995); *Con'l Cablevision v. United*

Here, Section 11.3.1(d) gives BodyArmor a right to terminate with cause if "[ABC] transfers or attempts to transfer, directly or indirectly, any of its rights or privileges hereunder in violation of Section 10.2 [of the Distribution Agreement]."[118] As in *Foundation,*[119] this language expressly encompasses only transfers undertaken by ABC. Certainly, BodyArmor could have drafted language in the Distribution Agreement expressly providing that transactions by a parent could trigger Section 11.3.1(d). Having chosen not to do so, the scope of BodyArmor's termination right was limited to actions or transactions taken by ABC that resulted in a transfer.

Moreover, even if Section 11.3.1(d) could be triggered by transactions undertaken above the ABC level, control of ABC did not change following the Merger in a way that transferred ABC's rights or privileges under the Distribution Agreement. ABC still had the same stockholders and the same controlling stockholder post-Merger. BodyArmor points out that the identity of two board members changed after the Merger, but a mere change in the individuals appointed to particular board seats is not a transfer by change of control when there has been no change in the entity with the power to appoint and remove those board members.

---

*Broad.*, 873 F.2d 717 (4th Cir. 1989). Although recognizing that those cases held that parent-level stock transactions triggered rights of first refusal, the New Hampshire Court found those cases included broadly worded transfer provisions that overcame the general rule that a transaction at the parent level does not constitute a transfer at the subsidiary level. *Id*. For similar reasons, this Court finds BodyArmor's reliance on those cases unpersuasive.

[118] Plf.'s Mot., Ex. 6 § 11.3.1(d).

[119] *Found. for Seacoast Health,* 953 A.2d at 427.

29

This ruling is consistent with the respect for and recognition of corporate separateness that is an essential part of both Illinois and Delaware law.[120]

### 2. The Merger did not result in a transfer by change in management.

Like the Court's finding that no change in control occurred, no change in management occurred that would entitle BodyArmor to be released from its contractual obligations under a plain reading of the Distribution Agreement. As set forth above, the Merger involved no action, direct or indirect, by ABC. Accordingly, Section 11.3.1(d) was not triggered. Although the identity of members of management changed, ABC's rights and privileges under the Distribution Agreement did not shift. ABC personnel remained responsible for the day-to-day and big picture decisions regarding ABC's relationship with BodyArmor. The fact that certain individuals assigned to oversee ABC's performance under the

---

[120] *See, e.g.*, *Manichaean Capital, LLC v. Exela Techs., Inc.*, 251 A.3d 694 (Del. Ch. May 25, 2021) ("Delaware embraces and will protect 'corporate separateness.'") (citing *NAMA Hldgs, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) ("Delaware law respects corporate separateness.")); *Pauley Petrol., Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 454 (Del. Ch. 1967) ("[T]he law must and does respect the separateness of the corporate entity . . ."); *see also Forsythe v. Clark USA, Inc.*, 836 N.E.2d 850, 854 (Ill. App. Ct. 2005) ("Under Illinois law, a corporation is deemed a distinct legal entity, separate from other corporations with which it may be affiliated."); *Tower Inv'rs, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007) ("Illinois courts will pierce the corporate veil where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances.") (citing *Pederson v. Paragon Pool Enter.*, 574 N.E.2d 165, 167 (Ill. App. Ct. May 24, 1991)).

Distribution Agreement changed did *not* transfer ABC's rights and duties to a new person or entity.

BodyArmor, however, argues the Merger effectively gave JAB authority over ABC's management and further contends BodyArmor always treated the Distribution Agreement as being with DPSG even though the agreement formally was between BodyArmor and ABC. BodyArmor's argument elides the involvement of multiple corporate lawyers in the drafting process as well as the bargained-for plain language of the Distribution Agreement as being a contract between ABC and BodyArmor. How BodyArmor "treated" or "viewed" the relationship does not alter the Distribution Agreement's plain terms identifying the agreement's parties.

Again, a simple example of how BodyArmor's interpretation of the Distribution Agreement would play out illustrates that no transfer by change in management occurred. It is undisputed that ABC formally held rights under the Distribution Agreement both before and after the Merger. Following the Merger, ABC's stockholders did not change, and its legal existence remained the same. Under BodyArmor's interpretation of the Distribution Agreement, although ABC legally remained responsible for executing the Distribution Agreement's terms, ABC nevertheless was obligated to seek BodyArmor's consent to a merger that occurred at ABC's corporate great-grandparent and that ABC had no power to prevent or alter. This obligation to seek BodyArmor's consent purportedly arose

31

simply because the identity of certain individuals managing ABC changed in connection with the Merger. This reading is not a reasonable interpretation of the Distribution Agreement.

In light of this Court's conclusion that the Merger did not trigger BodyArmor's right to terminate, ABC's secondary argument about whether BodyArmor reasonably could withhold its consent to the Merger is moot. ABC is entitled to summary judgment that BodyArmor breached the Distribution Agreement. Conversely, BodyArmor's motion seeking summary judgment in its favor as to the breach of contract claim must be denied.

## II. Factual issues preclude judgment as a matter of law regarding whether ABC's damages analysis is too speculative to be presented to the jury.

BodyArmor and Coca-Cola also moved for summary judgment as to two of ABC's three proffered damages calculations, arguing the calculations are speculative and based in part on lost profit damages, which BodyArmor argues the Distribution Agreement entirely prohibited. ABC's expert intends to offer three different damages calculations that vary based on how long the Distribution Agreement would have remained in place but for BodyArmor's breach in August 2018. The Distribution Agreement had an initial term of ten years, January 2015 to

January 2025, and automatically renewed for successive five-year terms.[121] During its initial term, BodyArmor could terminate without cause in January 2020, January 2022, or January 2024.[122] If BodyArmor terminated without cause on any of those dates, or if it did not renew in January 2025, it had to pay ABC a substantial termination fee.[123]

Rajiv Gokhale ("Gokhale") calculated damages as ABC's damages expert. Gokhale's first scenario hypothesizes that if BodyArmor would have terminated Without Cause in January 2020, ABC's damages would be its direct lost profits from August 2018 to January 2020 plus the termination fee.[124] Gokhale's second scenario assumes BodyArmor would not have renewed in January 2025, in which case ABC's damages would be its direct lost profits from August 2018 to January 2025 plus the termination fee.[125] Lastly, Gokhale calculates ABC's lost profit damages into perpetuity under the third scenario, which assumes BodyArmor would not have terminated the Distribution Agreement at any point.[126]

BodyArmor contends the second and third scenarios are speculative because it would have terminated the Distribution Agreement in January 2020.[127] ABC

---

[121] Plf.'s Opp. to Def. BA's Mot. for Summ. J (hereinafter, "Plf.'s Opp. to Def. BA's Mot."), Ex. 6 § 3.
[122] *Id*. § 11.2.
[123] *Id*. §§ 11.2, 11.5.
[124] *Id*., Ex. 124 at 7, n.25; 36, n.95.
[125] *Id*.
[126] *Id*.
[127] D.I. 535, Def. BA's Reply Br. at 17-20.

argues it has developed proof that if BodyArmor had not terminated the Distribution Agreement in 2018, it also would not have terminated in January 2020.[128]

**A. ABC presents sufficient evidence from which a jury could conclude the Distribution Agreement would have remained in effect beyond 2020.**

The evidence ABC cited in its opposition to BodyArmor's summary judgment motion reveals disputed factual issues as to whether the Agreement would have remained in place beyond January 2020.  ABC contends the Distribution Agreement renewed automatically for successive five-year terms, indicating a contractually created default for the Distribution Agreement to continue.[129]  The cost for BodyArmor to terminate in January 2020 would have been between $182 million and $264 million, producing an exit cost that might have served as a substantial barrier to termination.[130]  Further, ABC cites additional fact witnesses and expert testimony supporting its position that BodyArmor would not have terminated the Distribution Agreement in January 2020.[131]  This Court cannot resolve factual issues on a motion for summary judgment. If BodyArmor has conflicting evidence on this point, that conflict also is to be resolved by a jury.

---

[128] Plf.'s Opp. to Def. BA's Mot. at 34.
[129] *Id.*
[130] *Id.*, Ex. 124, Ex. 8.
[131] *Id.*, Ex. 113 § VI.; Ex. 125 at 243:10-25; Ex. 29 at 339:18-340:18.; Ex. 126 at 261:2-19; Ex. 29 at 208:2-10.

## B. Whether Gokhale's calculations are speculative will depend on the facts developed at trial.

Illinois prohibits damage calculations based on speculation.[132] Damages are speculative if there is no evidence in the record to support them.[133] BodyArmor argues that under Illinois law ABC's assumption that the Distribution Agreement would be renewed or not terminated at the earliest permissible time is speculation.[134] But the law is more nuanced and depends on the jury's determination of facts.

In *BTG International, Inc. v. Wellstat Therapeutics Corp.*, the Delaware Court of Chancery held after trial that awarding damages for the breached contract's renewal period would be too speculative.[135] The Court noted, however, that courts will award damages for a renewal term when a plaintiff can prove with reasonable certainty that the contract would have been renewed.[136] The *BTG International* Court acknowledged there was a "sound argument" that the plaintiff should receive

---

[132] *Raytheon Co. v. BAE Sys. Tech. Sols. & Servs. Inc.*, 2017 WL 5075376, at *9 (Del. Super. Ct. Oct. 30, 2017) ("If the profits a party seeks are merely speculative, possible or imaginary they cannot be recovered.") (internal quotation marks omitted).

[133] *Republic Bank of Chi. V. Desmond*, 579 B.R. 466, 491 (N.D. Ill. 2016).

[134] Def BA's Mot. at 30. ("Any damages premised on the hypothetical assumption that BodyArmor would have declined to exercise that right would not make ABC whole for the allegedly improper termination before that date but rather would provide ABC an unwarranted windfall based on speculation and conjecture.") *Id.*

[135] *BTG Int'l, Inc. v. Wellstat Therapeutics Corp.*, 2017 WL 4151172, at *20 (Del. Ch. Sept. 19, 2017). The *BTG International, Inc.* court applied Delaware law to its damages analysis, but BodyArmor cited the case in its motion for summary judgment. *See* Def. BA's Mot. at 30-31. The parties did not identify any differences between Illinois and Delaware law with respect to the availability of contractual damages.

[136] *Id.* at *20, n. 208 (citing *M&G Polymers USA, LLC v. Carestream Health, Inc.*, 2009 WL 3535466, at *9 (Del. Super. Ct. Aug. 9, 2009); *Supervalu, Inc. v. Assoc. Grocers, Inc.*, 2007 WL 624342, at *3 (D. Minn. Jan. 3, 2007)).

damages for the renewal term.[137] The Court of Chancery also concluded the plaintiff was entitled to damages for the entire initial term of the contract notwithstanding the defendant's right to terminate early "for convenience."[138] Although this Court remains skeptical that ABC will be able to show with reasonable certainty that the parties would have continued their relationship into perpetuity,[139] the factual disputes preclude summary judgment at this time. Defendant may, however, renew this argument at trial after ABC's presentation of its evidence.[140]

BodyArmor also mistakenly relies on *Monetti S.p.A. v. Anchor Hocking Corp.* to support its argument that damages for the renewal period would be speculative.[141] In that case, the Court granted a motion to exclude evidence on prejudgment interest separately or as a component of present value.[142] In *Monetti*, however, neither party had an option to renew the contract.[143] Here, the contract automatically renewed unless terminated, and BodyArmor would have to pay a substantial termination fee if it did not renew. Contrary to BodyArmor's position, several issues of fact

---

[137] *Id.* at *20.

[138] *Id.* at *19.

[139] Illinois courts generally find contracts that extend into perpetuity invalid. *See, e.g., Rico Indus., Inc. v. TLC Group, Inc.*, 6 N.E.3d 415, 420 (Ill. App. Ct. 2014) ("[W]e find that perpetual contracts are contrary to public policy.").

[140] Super. Ct. Civ. R. 50.

[141] *Monetti S.p.A. v. Anchor Hocking Corp.,* 1992 WL 67852, at *3 (N.D. Ill. Mar. 23, 1992) (dismissing as "mere speculation" plaintiff's damages claim based on a "substantial likelihood the contract would be renewed").

[142] *Id.* ("Lost profits are rarely determinable with enough precision to be considered liquidated and to merit prejudgment interest.")

[143] *Id.*

concerning when the Distribution Agreement would have been terminated exist in this case, including: (1) BodyArmor's CFO's testimony regarding whether BodyArmor would have considered staying after 2020;[144] (2) Repole's statements regarding wanting to stay long term;[145] and (3) the existence of a significant termination fee if BodyArmor did not renew the Distribution Agreement.[146]

**C. Section 21 bars only consequential lost-profits damages.**

Section 21 of the Distribution Agreement provides that "Neither [BodyArmor] nor [ABC] will be liable to the other party for any indirect, incidental, consequential, exemplary, special or punitive damages, including any loss of profit…"[147] BodyArmor argues Section 21 bars the inclusion of any lost profits in a damages calculation.[148] But BodyArmor's argument is not consistent with settled law. Under Illinois law, where a contract includes the phrase "including loss of profits…" after an exclusion of consequential damages, the phrase is meant to illustrate the types of consequential damages barred by the contract and does not preclude the recovery of direct lost profits.[149] Accordingly, Section 21 of the

---

[144] Plf.'s Opp. to Def. BA's Mot., Ex. 29 at 339:18-340:18.
[145] *Id.*, Ex. 127; Ex. 128; Ex. 129.
[146] *Id.*, Ex. 124, Ex. 8.
[147] *Id.*, Ex. 6 §21.
[148] Def. BA's Mot. at 32.
[149] *Aculocity, LLC v. Force Mktg. Holdings, LLC*, 2019 WL 764040, at *3 (N.D. Ill. Feb. 21, 2019).

Distribution Agreement does not bar all lost-profit damages, but only consequential lost-profit damages.[150]

Because ABC is seeking to recover direct lost-profit damages, Section 21 does not bar Gokhale's calculations. Direct damages are "the benefit of the bargain that the party lost from the contract itself, while consequential damages [are] economic harm beyond the contract's immediate scope.[151] To the extent BodyArmor contends some of ABC's damages calculation includes consequential lost profits, that classification issue is a fact question for the jury.[152]

### III. Coca-Cola is not entitled to summary judgment because Delaware law governs ABC's tortious interference claim.

In a separate motion, Coca-Cola argues this Court should enter judgment in Coca-Cola's favor for two reasons: (1) Georgia and not Delaware law applies to ABC's tortious interference claim under the "most significant relationship" test; and (2) ABC has not adduced evidence that Coca-Cola committed any "wrongful conduct" necessary to sustain the tortious interference claim against it.[153] Under Georgia law, "wrongful conduct" is required for a court to find that tortious

---

[150] Plf.'s Opp. to Def. BA's Mot., Ex. 6 § 21. ("Neither [BodyArmor] nor [ABC] will be liable to the other party for any indirect, incidental, consequential, exemplary, special or punitive damages, including any loss of profit . . .")

[151] *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1175 (Ill. App. Ct. 2015).

[152] *See Dyson, Inc. v. Syncreon Tech. (Am.), Inc.*, 2019 WL 3037075, at *8 (N.D. Ill. July 11, 2019); *Frank's Maint. & Eng'g v. C.A. Roberts Co.*, 408 N.E.2d 403, 409 (Ill. App. 1980).

[153] Def. Coca-Cola's Mot. for Summ. J. (hereinafter, "Def. Coca-Cola's Mot.") at 1.

interference has occurred.[154] But for the reasons set forth below, this Court holds that Delaware law, not Georgia law, applies to the tortious interference claim. The parties' arguments regarding whether Coca-Cola engaged in an "independently wrongful act" therefore are irrelevant. And whether Coca-Cola's actions were "without justification," which ABC must establish to sustain its tortious interference claim under Delaware law, is a question to be left for the jury.[155] Coca-Cola's summary judgment motion therefore is denied.

## A. Delaware has the "most significant relationship" to the parties and the current litigation under the *Restatement's* choice-of-law analysis.

When considering Coca-Cola's motion for summary judgment, the Court first must determine which state's law governs ABC's tortious interference claim.[156] Delaware has adopted the *Restatement (Second) of Choice of Law*'s[157] "most significant relationship" test for analyzing choice-of-law disputes like the one before the Court.[158] The Court begins this task by using the conflict-of-law framework, which involves two steps: (1) the Court first determines whether an actual conflict

---

[154] *Id*. Specifically, in Georgia, tortious interference with a contract requires proof of (1) an independent wrongful act of interference by a stranger to the contract; (2) malicious intent to cause injury; and (3) resulting damage. *See Hylton v. American Assn., etc.*, 448 S.E.2d 741 (Ga. 1994); *Singleton v. Itson*, 383 S.E.2d 598 (Ga. 1989).

[155] *Bhole, Inc. Shore Invs., Inc*., 67 A.3d 444, 453 (Del. 2013). Under Delaware law, the elements of a claim for tortious interference with contract are: (1) contract; (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract; (4) without justification; (5) which causes injury. *Id*.

[156] *KT4 Partners LLC v. Palantir Techs. Inc*., 2021 WL 2823567, at *12 (Del. Sup. Ct. June 24, 2021).

[157] RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971).

[158] *Certain Underwriters at Lloyds, London v. Chemtura Corp*., 160A.3d 457, 459 (Del. 2017).

between the states' laws exists and, if so, (2) the Court next decides which state has the "most significant relationship" to the present case.[159] For the reasons discussed below, Delaware law will apply to the tortious interference claim against Coca-Cola because an actual conflict between Delaware and Georgia law exists, and Delaware has the most significant relationship to this case when considering all the factors relevant to the *Restatement's* test.

### 1. Actual conflict exists between the laws of Delaware and Georgia for tortious interference claims.

The first step in a choice-of-law analysis is to decide if an actual conflict between the states' laws exists.[160] If no conflict is found, no choice-of-law analysis is necessary, and the forum state's laws will apply.[161] Here, both parties agree that a conflict in fact exists between Delaware and Georgia law for tortious interference claims.[162] The Court therefore must engage in a choice-of-law analysis because actual conflict between Delaware and Georgia law is undisputed.[163]

---

[159] *KT4 Partners LLC,* 2021 WL 2823567, at *12.
[160] *Id.*
[161] *Id.*
[162] D.I. 596, Tr. 101:6-11.
[163] *KT4 Partners LLC,* 2021 WL 2823567, at *12 (reasoning that the Court can avoid a choice-of-law analysis altogether if the result would be the same under either state's laws and Delaware law will apply because there is no conflict).

**2. Delaware has the "most significant relationship" to the present case under the *Restatement (Second) of Conflict of Laws* § 145.**

Delaware's choice-of-law analysis next requires this Court to decide which state (and therefore which state's law) has the "most significant relationship" to the present case.[164] This assessment requires an examination of the parties' contacts with the different states. The analysis is not mathematical, and the state determined as having the "most significant relationship" to the parties may not necessarily be the state with the *most* contacts.[165] Precedent holds that this Court may assign differing weight to the contacts as appropriate for the case's particular facts and issues.[166]

In *KT4 Partners LLC v. Palantir Technologies, Inc.*, this Court recently explained the mechanics of Delaware's choice-of-law analysis in the context of a tortious interference claim.[167] That Court, confronting a conflict between California and Delaware law, explained that the *Restatement (Second) of Conflict of Laws* § 145 provides a list of contacts intended to identify the state with the highest degree of interest in the parties and the subject matter of the litigation.[168] Specifically, Section 145 points Delaware courts to the following contacts to determine which state has the "most significant relationship" to the current case:

---

[164] *Id.* at *16.
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.[169]

Delaware courts evaluate these contacts according to their relative importance to the issues in each case.[170] No one contact is more important than another as a rule. Rather, the "most significant relationship test" requires a case-specific analysis that adheres to the *Restatement's* "core focus" of promoting legal consistency and honoring the parties' reasonable expectations.[171]

Section 145's factors lead this Court to apply Delaware law to the present litigation. First, the place of injury depends on the tort involved in the case.[172] For tortious interference cases, the place of injury is the *plaintiff's* headquarters.[173] Although Coca-Cola's principal place of business is Georgia, ABC's principal place of business is in Texas, not Georgia or Delaware. This contact will not be given much weight since neither party has argued that Texas law should apply.

Next, the alleged tortious conduct, in contrast to Coca-Cola's contentions, did not take place only in Georgia. ABC's evidence shows much of Coca-Cola's

---

[169] RESTATEMENT (SECOND) OF CONFLICT OF LAWS §145 (2) (1971).

[170] *Wavedivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 2011 WL 5314507, at *9 (Del. Sup. Ct. 2011).

[171] *KT4 Partners LLC,* 2021 WL 2823567, at *16.

[172] *Id.* at *17.

[173] *Id.*

42

engagement with BodyArmor took place across multiple different states even though some in-person meetings with BodyArmor and the office locations of some Coca-Cola personnel were in Georgia.[174] The Court therefore is unable to give this factor considerable weight because the allegedly tortious conduct did not occur in one principal location. This is true in part because there is not one precise moment in time when this tort was committed. Rather, unlike some other torts, Coca-Cola's alleged tortious interference took place over a period of months and through complex negotiations between parties who were located in different places. The protracted and dispersed nature of the challenged conduct makes it difficult for the Court to identify a "principal" location for Coca-Cola's conduct.

The location of ABC and Coca-Cola's principal places of business distinguishes the parties from one another.[175] But Coca-Cola and ABC do share one contact in common: both are incorporated in Delaware.[176] In fact, all three parties to this dispute are incorporated in Delaware. Even though mere incorporation is not necessarily the determinative factor in the "most significant relationship" test, it remains an important factor when determining which law to apply.[177] Further,

---

[174] Specifically, ABC contended during oral argument that several actions concerning the Distribution Agreement took place in California and New York as well as Georgia. *See also* Plf.'s Mot. at 19.

[175] ABC's principal place of business is Texas while Coca-Cola's is Georgia.

[176] The parties do not share a principal place of business in Georgia. In fact, BodyArmor's principal place of business in New York and ABC's is Texas.

[177] *Wavedivision Holdings,* 2011 WL 5314507, at *9.

Delaware courts have held that where there are two or more different principal places of business, a mutual nexus to Delaware controls.[178] This contact therefore weighs in favor of applying Delaware law to the present case.

Finally, the parties' relationship centers around Delaware, not Georgia. The Distribution Coordination Agreement between Coca-Cola and BodyArmor included Delaware choice of law and Delaware forum provisions. Both ABC and BodyArmor selected Delaware as their chosen forum for any disputes that arose between them. And significantly, the UPA between Coca-Cola and BodyArmor, which set out the terms of Coke's new investment in BodyArmor and prompted BodyArmor to breach the ABC-BodyArmor Distribution Agreement, included a specific indemnification clause that chose Delaware as the forum and governing law for *any* dispute involving Coca-Cola's liability to ABC.[179] Therefore, even though none of the allegedly tortious conduct occurred in Delaware, the relationship of all the parties to the current dispute does center around Delaware.

In considering the facts above, the Court here can adopt a commonsense approach similar to that employed by the *KT4* Court in resolving the choice-of-law question before it. In that case, the "thread unifying [the] parties [was] their shared

---

[178] *KT4 Partners LLC,* 2021 WL 2823567, at *17.
[179] Plf.'s Br. in Opp. to Def. Coca-Cola, Ex. 43.

state of incorporation: Delaware."[180]  Here, that thread unifies the parties not just by a shared state of incorporation but by contract terms that point the parties toward Delaware courts for dispute resolution.  Delaware meets the "most significant relationship" test.  Therefore, the tortious interference claim against Coca-Cola will be analyzed under Delaware law.

3. **The choice-of-law policy factors in the *Restatement (Second) of Conflict of Laws* § 6 do not alter this Court's conclusion that Delaware law applies to this case.**

In addition to considering the contacts listed in the *Restatement (Second) of Conflict of Laws* § 145, Delaware courts also consider policy factors set out in the *Restatement (Second) of Conflict of Laws* § 6, such as relevant policies of the forum, the protection of justified expectations, certainty, predictability, and ease in the determination of the law to be applied.[181]  Although these policy factors may be

---

[180] *KT4 Partners LLC*, 2021 WL 2823567, at *17.  Delaware courts have held that where there are two or more different principal places of business, a mutual nexus to Delaware controls. *Id.* (citing as examples, *Wavedivision Holdings, LLC v. Highland Cap. Mgmt. L.P.*, 2011 WL 5314507, at *9 (Del. Super. Nov. 2, 2011), *aff'd*, 49 A.3d 1168; *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *12 (Del. Ch. Oct. 31, 2012), *aff'd*, 74 A.3d 655; *cf. Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1238 (Del. Super. Ct. Nov. 27, 2012) (deeming [principal place of business] "a wash" because the parties were headquartered in two different states and one of the parties was not incorporated in Delaware); *UbiquiTel Inc.* v. *Sprint Corp.*, 2005 WL 3533697, at *4, n. 35 (Del. Ch. Dec. 14, 2005) (inferring that where, as [in *KT4*], at least one of the parties does "little or no business" at its headquarters, the *Second Restatement*'s emphasis on headquarters should be diminished).

[181] *Id.* at *16. Specifically, the guiding factors are: (a) the needs of the interstate and international system; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular area of law; (f) certainty, predictability, and uniformity of results; and (g) ease in the determination and

considered in a choice-of-law analysis, the Court need not defer to them completely. The policy considerations do not assist in suggesting which state's law to apply in this case. Accordingly, those factors have little-to-no bearing on the Court's analysis.

**B. At a minimum, a question of genuine material fact exists as to whether Coca-Cola tortiously interfered with the Distributing Agreement.**

Having concluded that Delaware law governs ABC's tortious interference claim against Coca-Cola, Coca-Cola's contention that ABC cannot prove wrongful conduct under Georgia law is moot. In Delaware, the focus of a claim for tortious interference with contractual relations is on the defendant's wrongful inducement of contract termination.[182] To prevail on a tortious interference claim under Delaware law, ABC must show (1) a contract existed, (2) about which Coca-Cola knew, (3) an intentional act by Coca-Cola was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) the act caused injury.[183]

It is undisputed that the Distribution Agreement was a valid contract between ABC and BodyArmor, and Coca-Cola knew about this contract. A tortious interference claim will fail without an actual breach of contract; mere termination of a contract is not sufficient to meet this standard.[184] Coca-Cola argued in its summary

---

application of the law to be applied. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 (1971).

[182] *ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749, 751 (Del. 2010).

[183] *WaveDivision Holdings, LLC,* 2011 WL 5314507, at *6.

[184] *Beard Research Inc., v. Kates, ASDI, Inc.* 8 A.3d 573, 607 (Del. Ch. 2010).

judgment motion that BodyArmor's termination of the Distribution Agreement was permissible.[185] But this Court, for the reasons stated in Section I of this Opinion, has concluded BodyArmor did not have the right to terminate the Distribution Agreement as a result of the Merger. Coca-Cola's negotiation and creation of its own distribution agreement with BodyArmor while BodyArmor was still under a valid contract with ABC therefore was an intentional act that a jury could conclude was a significant factor in causing the breach and ABC's associated injury.

These facts, however, are not enough to establish ABC's tortious interference claim. ABC also must demonstrate that Coca-Cola's intentional acts that caused the breach were "without justification." Coca-Cola contends it did not engage in actionable misconduct.[186] But at the very least, a question remains as to whether the negotiations with BodyArmor and Coca-Cola's insistence on a new distribution agreement while a valid contract between BodyArmor and ABC existed was "without justification." This element of the tortious interference claim will involve a consideration of many factors and is challenging to meet.[187] The Court may not

---

[185] Def. Coca-Cola's Mot. at 17.

[186] *Id*.

[187] The following factors help Delaware courts decide whether the act was "without justification:" (a) the nature of actor's conduct; (b) the actor's motive; (c) the interest of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interest in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relationships between the parties. *WaveDivision Holdings, LLC,* 2011 WL 5314507, at *11.

rule as a matter of law as to this element because there are factual questions that the jury must resolve as to whether Coca-Cola's conduct was "without justification."

## CONCLUSION

For the foregoing reasons, ABC's motion for partial summary judgment is **GRANTED** and BodyArmor's motion for summary judgment is **DENIED** on the issue of breach of contract. A question of fact remains for the damages calculation, and BodyArmor's motion for summary judgment regarding that issue also is **DENIED**. Because Delaware law governs the tortious interference claim, and whether Coca-Cola's conduct was justified is a factual issue for the jury, Coca-Cola's motion for summary judgment likewise is **DENIED**. **IT IS SO ORDERED.**